JOSÉ SOTO,

                Plaintiff,

    v.

                                    ORDER

NANCY WHITE, JEFFREY MANLOVE,
DONNA LARSON, BELINDA SCHRUBBE,         17-cv-551-jdp
ANN YORK, GAIL WALTZ, AMY GUNDERSON,
ANN SCARPITA, and CHRYSTAL MARCHANT,

                Defendants.

Pro se plaintiff José Soto, a prisoner at Waupun Correctional Institution (WCI), alleges that defendants, current and former medical providers at WCI, failed to provide adequate treatment for his plantar fasciitis and Achilles tendonitis in violation of the Eighth Amendment to the United States Constitution. He says that defendants have been aware of his medical conditions since January 2015, but they have ignored his requests for more supportive shoes, better fitting orthotics, and other treatment that would alleviate his pain.

There are three motions currently before me: (1) defendants' motion for summary judgment, Dkt. 84; (2) Soto's motion for an injunction "order[ing] defendant York's husband [to] stop retaliation, cease continued harassment, and issue typewriter to type motions for summary judgment," Dkt. 107; and (3) Soto's motion for an emergency injunction directing defendants to send him to a podiatrist and correct his orthotics, Dkt. 146. For the reasons explained below, I will grant defendants' motion for summary judgment, deny Soto's motions for injunctive relief, and dismiss the case.

# UNDISPUTED FACTS

The following facts are undisputed except where noted.

## A.  The parties

Plaintiff José Soto is a prisoner at WCI. He suffers from plantar fasciitis and Achilles tendinitis, two painful foot conditions that he says stem from congenital foot deformities. Defendants are current and former health care providers in WCI's health services unit (HSU). Dr. Jeffrey Manlove was Soto's treating provider for much of the period relevant to this suit. Chrystal Marchant is the current health services manager at WCI, which means she monitors and manages the health services provided to WCI's inmate population. Soto has also named three former WCI health services managers as defendants: Nancy White, Belinda Schrubbe, and Ann Scarpita. Donna Larson and Ann York are registered nurses currently employed at WCI. Gail Waltz and Amy Gunderson are registered nurses previously employed at WCI.

Soto's claims in this suit concern his ability to obtain treatment to address his foot pain. I'll summarize the policies and procedures that govern Soto's access to treatment before turning to the factual allegations underlying Soto's claims.

## B.  Relevant DOC policies

WCI provides all inmates with state-issued shoes. But inmates may also buy and wear "personal shoes," which are shoes available for purchase from an approved vendor catalog. As a general rule, inmates are not permitted to wear personal shoes when housed in segregation. Instead, they are given "plastic Croc-like shoes or canvas slip-ons" to wear. Dkt. 141, ¶ 30.

The DOC has a policy governing medically necessary items, Policy 300.07, which has a subsection about shoes. It provides that: (1) prisons will provide "customized special medical orthopedic shoes" (i.e., shoes specially customized by an orthotic company using a mold or

plastic cast of the inmate's feet) when a treating provider submits and a reviewing official approves the appropriate authorization form; (2) HSU does not issue, purchase, or authorize special shoe purchases if the inmate is able to wear regular shoes, and it will only provide inmates with alternatives to the regular state-supplied footwear in limited, case-by-case circumstances when an inmate cannot wear the state-supplied footwear due to a significant medical condition; and (3) HSU is not involved in ordering extra pairs of personal shoes for inmates. Dkt. 141, ¶ 28.

## C. Soto's 2013 settlement agreement

Soto has long maintained that the DOC-provided treatment for his foot conditions is inadequate. In 2011, he filed suit against several employees of Columbia Correctional Institution (CCI), his former institution, alleging that they violated his rights under the Eighth Amendment. *See Soto v. Suliene*, No. 11-cv-567-slc (filed Aug. 10, 2011). He entered into a settlement agreement with those defendants and dismissed the case in 2013. The terms of that settlement entail certain deviations from the DOC's standard shoe policy.

According to the agreement, DOC will provide Soto with custom orthotics at its own expense, which he can wear in general population at any DOC institution. If those custom orthotics are removable rather than built into Soto's shoes, Soto can buy his own shoes from any vendor including vendors outside of the canteen catalogs, so long as the vendor is approved by the Department of Adult Institutions (DAI) and the shoes comply with the DAI's policy on shoes. Soto must buy those shoes using his own funds. He may only wear them while in general population. If Soto is housed in segregation at any DOC institution, he is to be provided with black Velcro shoes and arch support inserts, at DOC's expense. Dkt. 90-3, ¶ 2.

Soto was transferred to WCI in 2011, and in the years following the 2013 settlement, he occasionally filed motions in the 2011 case seeking to enforce the settlement agreement against officials at WCI who he said were violating it. *See* No. 11-cv-567, Dkt. 150; Dkt. 157; Dkt. 163; Dkt. 177; Dkt. 206. Those motions have been denied by this court. Soto also filed this lawsuit on July 17, 2017. He does not seek to enforce his 2013 settlement through this suit, but the settlement is necessary context for understanding Soto's interactions with defendants.

**D. Soto's medical treatment**

The allegations relevant in this case begin in January 2015, but understanding them requires going back to Soto's appointments with a University of Wisconsin podiatrist, Dr. Jill Migon, starting in 2013.

### 1. Soto's consultations with Migon

On October 25, 2013, Migon evaluated Soto's feet and concluded that he had plantar fasciitis and Achillles tendinitis. She had casts made for a pair of customized orthotics and she gave Soto a handout on stretching exercises for his Achilles tendon. She recommended icing and a night splint, and if those measures proved ineffective, physical therapy. She noted that "[i]f the PT, night splint orthotics, stretching, and icing are not effective, then he can return to the clinic to see me for further assistance." Dkt. 88-1, at 9. Per those recommendations, Soto was given permanent medical restrictions to (1) wear a night splint; (2) wear custom orthotics at all times, even while in segregation; and (3) wear black Velcro shoes while in segregation. Dkt. 141, ¶¶ 47, 48. Because the custom orthotics were removable, they could be worn in both Soto's black Velcro segregation shoes and the personal shoes that Soto had at that time. *Id.* ¶ 49.

Soto saw Migon again on May 2, 2014. In her clinical notes, she noted that Soto had been icing, stretching, using a night splint, and wearing the custom orthotics with some mild improvement. She noted that Soto was continuing to have pain associated with his right Achilles tendon, but that the plantar fasciitis in his left heel had resolved. Soto reported that his "right orthotic cause[d] him to turn his foot out and walk on the side of his foot," causing discomfort. Dkt. 88-1, at 8. So Migon modified the right orthotic to decrease the height of the arch. She again recommended physical therapy for the Achilles tendon and for the plantar fasciitis on the right side. Soto began a course of physical therapy starting on June 20, 2014.

On January 27, 2015, Soto had an appointment with Manlove at WCI, at which he complained of foot pain due to his orthotics no longer fitting correctly. Dkt. 88-1, at 131. That same day, Manlove submitted a request to the Bureau of Health Services' medical director requesting approval for a podiatry evaluation and repair or refitting of Soto's orthotics, which was approved. *Id.* at 238–39.

On February 20, 2015, Migon saw Soto for a third time. In her clinical notes, she stated that Soto was continuing to complain of pain on the left side, and that he had "tried continuing to wear his custom orthotics and has also tried physical therapy, night splint and icing without any improvement. . . . He relates that he believes that his orthotic is sinking in causing him to have pressure at the ball of the foot from the orthotic from poor shoes." *Id.* at 6. Migon applied a metatarsal pad to his right orthotic to help diminish some of the pain. She also noted that "the state issued athletic shoes are very unsupportive, flimsy, and the orthotic seems to be sitting or sinking into the heel," and suggested that "a better quality shoe, such as New Balance or similar athletic shoe that can fit his orthotics, will likely resolve the right foot pain." *Id.* Migon prescribed Soto a "Bledsoe boot" to immobilize his foot and directed him to wear it for

six weeks and to stop all physical activity. Dkt. 141, ¶ 56. She advised that if Soto was continuing to have problems after six weeks, "an MRI would likely be the next step." Dkt. 88-1, at 6.

The claims at issue in this case concern what happened after Soto's third appointment with Migon. Manlove did not order new shoes for Soto following this appointment, and the parties dispute whether Migon's note obligated him to. Defendants contend that per Policy 300.07, the health services unit does not order personal shoes for inmates, and it will get involved in personal shoe-related issues only if the inmate is unable to wear the state-issued footwear for medical reasons. Dkt. 141, ¶ 57. And because Soto was housed in general population at this time, he was free under the terms of his 2013 settlement agreement to buy personal shoes from any outside vendor so long as they complied with prison policies. *Id.* ¶ 59.

Soto counters that Manlove "was obligated" by Migon's treatment note to obtain "better supportive shoes" for him. *Id.* ¶ 57. He says that defendants lied to him by telling him that they had ordered him New Balance shoes when they hadn't. Dkt. 140, ¶¶ 7–8. And indeed, in March 2015, Soto did receive two written communications from Nurse Larson indicating that shoes had been ordered for him. *See* Dkt. 124-2, at 72 (in response to a March 10, 2015 health service request from Soto asking about whether size 9.5 shoes for his orthopedics had been ordered, Larson responded "I will order you New Balance size 9.5 EEE per the podiatrist recommendation"); *id.* at 76 (in response to a March 17, 2015 health service request from Soto asking when he would receive the shoes, Larson wrote "the shoes are ordered. When they come in HSU will call you over to get them."). It is undisputed that Soto never got the promised shoes. Defendants contend that, regardless the representations Larson made on Soto's health

service requests, as a nurse, she lacked authority to order Soto new shoes. Dkt. 140, ¶ 8; Dkt. 141, ¶ 24.

### 2. Transfer to Wisconsin Resource Center

In March 2015, Manlove ordered that Soto be scheduled for a follow-up appointment with Migon. Dkt. 88-1, at 207. This appointment never happened, because a few weeks later Soto was transferred to the Wisconsin Resource Center. During that time, Soto was under the care of a different physician, Dr. Loyda Loria. Loria discontinued the Bledsoe boot and noted that Soto "claims that the left foot is better, however, his right heel has been starting to hurt since he was putting more weight on it when he was wearing the boot on his left foot." *Id.* at 124. She noted that there was "tenderness on the right Achilles tendon," but "no redness or swelling." *Id.* She gave Soto gel insoles to use with his state shoes.

### 3. Return to WCI

Soto returned to WCI in May of 2015. Over the next three years, Soto did several stints in segregation, requiring him to alternate between his personal shoes and the black Velcro segregation shoes provided under the 2013 settlement agreement. *See* Dkt. 141, ¶ 32 (chart of Soto's housing assignments during the relevant period).

In the spring of 2015, Soto began making frequent health service requests to HSU about a variety of health concerns, including his understanding that HSU staff had ordered better-fitting personal shoes for him. *See, e.g.*, Dkt. 124-2, at 84 (May 16, 2015 request in which Soto asked when the New Balance shoes would arrive, with a response indicating that Soto was seen by HSU on May 19, 2015). Soto asked for and received a new pair of black Velcro segregation shoes to wear while in segregation (as per his 2013 settlement). *See id.* at 32 (Soto's May 28, 2015 interview request to "Stores," an on-site department at WCI where state-issued footwear

is maintained). But Soto found that the black Velcro segregation shoes did not properly support his orthotics. So Soto began trying to negotiate some sort of alternative arrangement with HSU, even offering to buy his own segregation shoes. *See id.* at 86 (June 1, 2015 health service request in which Soto complained of foot pain, asked about the New Balance shoes, and inquired whether HSU would allow him to purchase his own shoes for use in segregation). In response, Larson wrote that she had forwarded Soto's inquiry to the health services manager, and also that HSU had received the New Balance shoes that day and would have Soto "called over to receive them." *Id.*

### 4. Dissatisfaction with black Velcro segregation shoes

In mid-June of 2015, Soto's assertions about HSU's obligations shifted. He began asserting in communications to HSU that per the 2013 settlement and Migon's February 20, 2015 clinical notes, HSU was required to replace his black Velcro segregation shoes with a different, more supportive type of shoe. *See id.* at 30 (in June 12, 2015 letter to HSU, Soto wrote: "Podiatrist issued order for shoes not Velcro state D.O.C. shoes as rubber block/gel at back sink causing my orthotics to be slanted."). In response to Soto's inquiries, the health services manager told Soto that the black Velcro segregation shoes were all he was entitled to under the settlement so long as he remained in segregation. *See id.* at 91 ("Mr. Soto—I have spoken to Segregation Captain who will make sure you are measured for black Velcro shoes per your court order. I cannot change policy related to property—you need to address that with WCI.").

On June 25, Soto returned to general population, so he was once again free to wear his own personal shoes so long as they complied with the DAI's shoe policy. But Soto continued to ask HSU about the size 9.5 New Balance shoes he believed had been ordered for him. *See*

*id.* at 92 (July 4, 2015 HSR); *id.* at 31 (July 29, 2015 interview request to Scarpita); *id.* at 94 (July 29, 2015 HSR).

On August 4, 2015, Soto went back to segregation. He continued lodging complaints about his shoes. *See, e.g.*, *id.* at 109 (August 10, 2015 clinical progress notes); Dkt. 124-3, at 64 (inmate complaint dated August 19, 2014); *id.* at 3 (August 27, 2015 clinical progress notes). He also complained that he was in pain, and that the HSU staff was not doing enough to treat it. *See id.* at 96 (in August 21, 2015 HSR, Soto wrote "just saw RN, spoke to LPN, MD, but <u>no one</u> examined feet. Feet are <u>killing</u> me . . . . When are you going to comply with 2/20/15 podiatrist order?").

On September 3, 2015, Soto had an appointment with Dr. Manlove. In his clinical notes, Manlove noted that Soto's "black Velcro shoes are in poor repair." Dkt. 124-3, at 3. Manlove recommended to the health services manager that Soto receive new shoes. Dkt. 141, ¶¶ 65, 66. It is not clear whether or when Soto received the new shoes. Manlove also wrote an order for a medical restriction allowing Soto to exceed the $75 spending limit for personal shoe purchases (for when Soto got out of segregation). *Id.* ¶ 67. Soto returned to general population on September 14 and remained there for more than a year.

### 5. Soto's year in general population

During his year in general population, Soto had several additional appointments with Manlove, but Manlove made no notes in Soto's medical file relating to Soto's foot issues. *See* Dkt. 88-1, at 84, 85, 90, 91. Soto objects that he "does not control what is written by MD," but he does not actually assert or cite any evidence that he raised his foot-related concerns to Manlove during this period. *See* Dkt. 141, ¶ 68. Indeed, only one medical document in the record from that period makes any reference to Soto's foot pain. *See* Dkt. 124-3, at 5 (nurse's

progress note from September 17, 2015 that reads: "Still c/o chronic foot pain wants new shoes. Looked like had brand new pair of athletic shoes on today. Pt. left the building as I went to consult HSU manager."). The record contains no other HSRs, interview requests, or inmate complaints from that time in which Soto complained of foot pain.

### 6. Renewed complaints about black Velcro segregation shoes

Soto went back to segregation on September 30, 2016, at which point he resumed his complaints about the inadequacy of the black Velcro segregation shoes. In an October 30, 2016 health services request, Soto asked whether the health services manager would authorize him to purchase his own segregation shoes. In response, an HSU representative reminded Soto that his settlement agreement provided that "if you are housed in segregation, you shall be provided with black Velcro shoes and arch support inserts. Therefore, no extra shoes will be approved until you are out of [segregation]." Dkt. 124-2, at 100.

Soto and HSU continued to talk past each other for several weeks. Soto would insist that he was entitled to shoes more supportive than the black Velcro segregation shoes, and HSU would respond by telling him that, per the terms of his 2013 settlement, he was stuck with the black Velcro shoes while in segregation. *See id.* at 102 (November 1, 2016 HSR); Dkt. 124-3, at 13 (clinical progress notes from November 10, 2016); Dkt. 142-2, at 60 (December 26, 2016 HSR); *id.* at 37 (January 3, 2017 letter to Marchant). There is some suggestion that WCI's special needs committee began considering whether to authorize Soto specialized shoes for segregation, as per Policy 300.07. *See* Dkt. 124-3, at 16 (in Soto's medical progress notes from January 12, 2017, a nurse noted: "Patient wants shoes to be labeled as medical necessity so he can have 2 pair in addition as personal shoes: Discussion [related to] patient's shoes has long [history] and is being addressed through special needs. Clinician(s)

unable to provide additional information."). But the parties don't propose any findings of fact on this issue, so the sequence of events is not clear.

Soto returned to general population again in January of 2017, and, with only three brief exceptions, he stayed out of segregation for the remainder of the period at issue in this case. He continued to file intermittent complaints. *See* Dkt. 124-2, at 38 (January 18, 2017 letter to Marchant), 74 (March 8, 2017 HSR); 40 (March 19, 2017 letter to White); Dkt. 88-1, at 379 (August 17, 2017 letter to Marchant); *see also id.* at 213 (Larson's response to Soto's August 17, 2017 letter). In July of 2017, Soto filed this suit.

Despite Soto's complaints, notes from Dr. Manlove's appointments with Soto from the first eight months of 2017 do not contain references to Soto's foot pain. *See* Dkt. 88-1, at 49 (February 27, 2017); *id.* at 45 (May 10 and 17, 2017); *id.* at 41 (June 16, 2017); *id.* at 38 (July 27, 2017); *id.* at 32 (August 22, 2017). Again, Soto objects that he "does not control what is written by MD," but he does not actually assert or cite any evidence that he raised his foot-related concerns to Manlove during this period. *See* Dkt. 141, ¶ 68.

### 7. Soto's shoes and orthotics go missing

On September 13, 2017, Soto submitted an HSR that read as follows: "I have <u>NOT</u> been issued orthotics nor shoes <u>yet</u>?! Please issue me <u>BOTH</u> ASAP! See (ct order). 'Thank you'!" *Id.* at 375. Marchant called WCI's property department to ask about the status of Soto's property, and was told that as far as they knew, Soto had his shoes and orthotics with him. Marchant explained this to Soto on the bottom of the HSR, noting that she was "very confused on <u>what</u> shoes you need. If you feel your shoes are worn out and need new pair then make an appt to have your shoes evaluated." *Id.*

On October 4, 2017, Soto was seen by a nurse to discuss his shoes and orthotics. In her notes, the nurse wrote that Soto indicated that his "personal black Velcro shoes & custom orthotics" were "lost" when he moved cell halls in June. *Id.* at 32. (Soto disputes this and says that he actually told the nurse that "staff" had taken his shoes and orthotics and later falsely claimed they had been lost. *See* Dkt. 141, ¶ 74. But he doesn't provide any further explanation about which staff took his belongings and why.) Soto told the nurse that he wanted replacement shoes that were "New Balance shoes from a 2015 order" instead of black Velcro shoes. *Id.* The nurse forwarded Soto's request to Marchant for review. The next day, Marchant sent Soto a memorandum asking him to provide further explanation as to why he no longer had the shoes and custom orthotics. *Id.* ¶ 75. It is not clear whether Soto ever provided the requested response.

### 8. Difficulties finding black Velcro shoes that fit

On October 16, 2017, Soto submitted another HSR stating that he still had no orthotics and that Stores did not have size 9.5 EEE black Velcro shoes in stock. *Id.* ¶ 75. Marchant responded: "1. Stores is ordering you the size you need. 2. You are scheduled for you to see podiatry about your orthotics." Dkt. 88-1, at 365. On November 1, Marchant received an email from a sergeant in Stores stating that he had ordered, and had Soto try on, three different pairs of black Velcro shoes in size 9.5 EEE, but that Soto had indicated that none of those pairs fit him. Dkt. 141, ¶ 86. Soto disputes this and asserts that none of the shoes he tried on that day were size 9.5 EEE. *Id.*

On November 8, 2017, Dr. Manlove wrote a consult order to send Soto to an orthotist for replacement custom orthotics and shoes. Dkt. 88-1, at 169. Even after moving around other patients' non-urgent appointments, the soonest available appointment with the orthotist was

February 27, 2018. In the meantime, Soto continued complaining about not having black Velcro shoes and orthotics. Dkt. 124-3, at 51. Marchant responded by telling Soto that he was scheduled to see the orthotist for his orthotics, and that he would need to contact Stores for a pair of black Velcro shoes. *Id.* This continued for several weeks, with Stores repeatedly giving Soto shoes to try and Soto rejecting them as not the right size. *See* Dkt. 141, ¶¶ 89–90; Dkt. 124-3, at 47. After trying on multiple pairs with no success, Marchant told Soto that they would wait until after his orthotist appointment to see if that yielded any recommendations. She requested that a larger size of black Velcro shoes be ordered for Soto in the meantime. Dkt. 141, ¶ 91.

### 9. Soto goes to an orthotist for custom shoes and orthotics

On February 27, 2018, Soto had his appointment with the orthotist, who measured and cast his feet for custom orthotics. In addition to the custom orthotics, the orthotist placed an order for a pair of Velcro black Orthofeet 651 shoes. He recommended that Soto wear the custom orthotics with these shoes at all times, because they offer the necessary support. Dkt. 141, ¶ 93. Soto would be allowed to wear his Orthofeet shoes anywhere in WCI, including in segregation. This eliminates the need for Soto to wear the black Velcro segregation shoes that were the frequent subject of his complaints. *Id.* ¶ 98.

Soto received his custom orthotics and Orthofeet shoes in late June or early July of 2018. Almost immediately, Soto began complaining that the orthotics were not correct. Dkt. 124-3, at 53 (HSR dated July 12, 2018); *id.* at 54 (HSR dated July 19, 2018). At an appointment on October 2, 2018, Manlove wrote: "The patient also notes that his orthotics . . . work well with his black Velcro [Orthofeet] shoes . . . (which I believe are his state shoes) . . . he cannot fit them into his personal shoes. I did examine them and confirm this."

Dkt. 88-1, at 690. Manlove ordered a referral to the orthotist to determine whether Soto "need[ed] modification of his orthotics or another pair for his [personal] shoes." *Id.*

## ANALYSIS

Defendants move for summary judgment on all of Soto's claims. A court must grant summary judgment when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). In evaluating defendants' motion, I must view the evidence in a light most favorable to Soto, the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But Soto also bears the burden of coming forward "with specific facts showing that there is a genuine issue for trial." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). He must offer more than just conclusory allegations. *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 840 (7th Cir. 1996).

## A. Eighth Amendment claims

Soto contends that all nine defendants were "deliberately indifferent" to his serious medical needs in violation of the Eighth Amendment. To succeed on an Eighth Amendment claim, Soto must show that: (1) he has a serious medical need, and (2) the defendants were aware of that need but disregarded it. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). For purposes of summary judgment, defendants don't dispute that Soto's foot conditions qualify as a serious medical need under the Eighth Amendment. But they say that Soto does not have

sufficient evidence to prevail on the second element. To survive summary judgment, Soto must adduce evidence that each defendant was aware of Soto's foot condition and disregarded it.

When the defendant is a medical professional who has provided some treatment to the plaintiff, the question is whether that treatment was constitutionally adequate. *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). To prove that it was not, Soto must show that the treatment was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (quoting *Duckworth*, 532 F.3d at 679). Allegations of medical malpractice or negligence— even "gross negligence"—are insufficient to meet the deliberate indifference standard. *Farmer v. Brennan*, 511 U.S. 825, 836 n.4 (1994). Likewise, mere disagreement with a doctor's medical judgment is insufficient to establish deliberate indifference. *Berry v. Peterman*, 604 F.3d 435, 442 (7th Cir. 2010). Delays in treatment for a serious medical need may constitute deliberate indifference if the delay "exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowarn v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010).

For reasons explained in more detail in the following sections, I conclude that Soto has not produced evidence sufficient for a jury to infer that defendants' treatment of his foot conditions was constitutionally inadequate. At most, Soto's evidence shows that defendants interpreted Migon's February 20, 2015 treatment note differently than Soto did, and that defendants sometimes provided confusing, contradictory responses to Soto's inquiries about whether HSU had ordered him New Balance shoes in response to Migon's suggestion. When Soto and defendants did manage to to communicate effectively, defendants made legitimate efforts to address Soto's complaints by scheduling Soto for appointments at HSU, giving him various shoe- and foot-related medical restrictions, and scheduling him to see an orthotist.

Defendants' efforts fell short of Soto's expectations and took longer than Soto would have preferred, but that is not a basis for an Eighth Amendment claim.

Soto's Eighth Amendment claims can be subdivided into five components. He alleges that defendants: (1) disobeyed Migon's order by failing to purchase him more supportive shoes; (2) unreasonably delayed in replacing his orthotics and procuring him the Orthofeet shoes; (3) failed to ensure that the Orthofeet shoes were effective to address his pain; (4) failed to physically examine his feet or treat his swelling, pain, and bruises; and (5) failed to send him back to Dr. Migon for follow-up appointments.

### 1. Failure to purchase Soto more supportive shoes after his appointment with Dr. Migon

Soto says that defendants' failure to purchase him the "better quality shoe" recommended in Migon's February 20, 2015 clinical note constitutes deliberate indifference. Evidence that a prison doctor ignored an outside specialist's instructions for a prison inmate can be sufficient to survive summary judgment on an Eighth Amendment claim. *See Gil v. Reed*, 381 F.3d 649, 662–64 (7th Cir. 2004). But Migon's clinical note was phrased in suggestive rather than mandatory terms. Dkt. 88-1, at 6 ("I would also suggest a better-fitting athletic shoe since the state issued athletic shoes are very unsupportive, flimsy, and the orthotic seems to be sitting or sinking into the heel causing him to have more pressure on the forefoot."). Policy 300.07 made clear that inmates were responsible for purchasing their own personal shoes, that HSU would not get involved with ordering personal shoes, and that HSU would procure alternatives to the state-supplied footwear in only "very limited," "case by case" circumstances. Dkt. 141, ¶ 28. At the time of his February 20, 2015 appointment with Migon, Soto was in general population, so per the terms of the 2013 settlement agreement, he could

buy and wear personal shoes from any vendor so long as they complied with the DAI's shoe policy.[1] In light of these circumstances, defendants' determination that Migon's note imposed no obligation that they order Soto different shoes was reasonable and did not constitute conscious disregard of the problem.

Soto reasonably assumed that WCI would purchase him better quality shoes, especially after he received correspondence from Nurse Larson stating, apparently erroneously, that "New Balance size 9.5 EEE" shoes had been ordered for him "per the podiatrist recommendation." Dkt. 124-2, at 72; *see also id.* at 76, 86. But this case isn't about whether Soto had New Balance shoes; it's about whether he received constitutionally adequate care. The evidence shows that he did.

Prior to March 19, 2015, Soto was in general population, so he was free to wear his personal shoes rather than his state-issued shoes. (Soto points to no evidence that he lacked the funds to purchase personal shoes.) Between March 19 and May 13, 2015, Soto was at the Wisconsin Resource Center and therefore not under defendants' care. Between May 13 and June 25, 2015, and again between August 4 and September 14, 2015, Soto was in segregation at WCI, but the main focus of his HSRs during those periods was the status of the New Balance shoes he believed had been ordered. It wasn't until much later that it became clear that Soto was alleging that the black Velcro shoes he was specially permitted to wear in segregation under

---

[1] Soto tries to dispute that he was permitted to wear personal athletic shoes while in general population, Dkt. 141, ¶ 31, but the only evidence he cites in support of this contention are interview requests he wrote to a non-defendant WCI official who allegedly confiscated his personal Nike Air Max shoes in late August of 2018. *See* Dkt. 124, ¶ 21 and Dkt. 124-3, at 55, 57. That was after the events at issue in this case. During the period under review here, it is undisputed that Soto was allowed to wear personal shoes while in general population.

the terms of his settlement agreement had a fundamental design flaw, independent of the issue regarding Migon's clinical note.

In the meantime, defendants took measures aimed at addressing Soto's complaints. On September 3, 2015, Manlove noted that Soto's black Velcro segregation shoes were "in poor repair," Dkt. 124-3, at 3, and spoke to the health services manager about procuring him new ones. Dkt. 141, ¶ 66. Manlove also gave Soto a medical restriction permitting him to exceed the $75 spending limit for personal shoe purchases. *Id.* ¶ 67. At that point, Soto ceased complaining for more than a year. There is no record of him submitting any foot- or shoe-related HSRs when he was in general population between September 14, 2015 and September 30, 2016. Under those circumstances, no reasonable jury could find that defendants were aware that Soto needed better segregation shoes but disregarded that need in the months following his February 20, 2015 appointment with Migon.

## 2. Delay in replacing orthotics and procuring Orthofeet shoes

Ultimately Soto succeeded in getting defendants to replace his black Velcro segregation shoes with custom Orthofeet shoes, which he was allowed to wear in both segregation and general population. But Soto says that defendants nonetheless violated the Eighth Amendment because it took them such a long time to procure the new orthotics and accompanying shoes. He says that defendants prevented him from receiving better shoes "between 2/20/15 thr[ough] 6/29/18"—a delay of "three years and five months." Dkt. 121, at 11. The record does not bear this out. As already discussed, most of Soto's complaints in 2015 were specifically related to the New Balance shoes he believed had been ordered for him. Soto's near-complete silence regarding defects with his shoes during his subsequent year in general population (September

14, 2015 to September 30, 2016) would have led defendants to reasonably conclude that Soto's shoe-related concerns had been addressed.

Soto complained about his shoes after returning to segregation on September 30, 2016. He was repeatedly told that under the terms of his settlement agreement, he was entitled only to the black Velcro segregation shoes with orthotic inserts that he already had. *See, e.g.*, Dkt. 124-2, at 100; *id.* at 102; Dkt. 124-3, at 13. Even so, defendants made efforts to address Soto's complaints while abiding by the 2013 settlement agreement. They brought him in for frequent appointments with HSU in response to his complaints, *see, e.g.*, Dkt, 123-3, at 7, 13, 14. They continued to give him a permanent medical restriction for a foot splint, *see* Dkt. 88-1, at 217, as well as intermittent restrictions for ice. *See id.* at 217. Soto also had access to ibuprofen and other pain relievers. *See* Dkt. 141, ¶ 101. And in January 2017, Soto returned to general population, where he was once again allowed to wear his personal shoes. Soto then filed an additional HSR, sent three letters, and filed this lawsuit. But at the same time, he continued to see Manlove regularly, and Manlove's treatment notes make no reference to complaints of foot pain. *See* Dkt. 88-1, at 49, 45, 41, 38, 32.

When Soto reported on September 17, 2017, that his shoes and orthotics were missing, Marchant took prompt action to figure out what had happened to them and then tried to work with Stores to procure black Velcro shoes in the size Soto needed. Meanwhile, Manlove wrote an order for Soto to see an orthotist for replacement orthotics, which was scheduled for the earliest available date. Soto says that defendants were responsible for the delay in getting him in for an appointment, but there is no evidence that is the case. Indeed, it is common for specialists to be booked out months in advance. To be held liable, "a defendant must have been 'personally responsible' for the deprivation of the right at the root of a § 1983 claim." *Backes v.*

*Vill. of Peoria Heights, Ill.*, 662 F.3d 866, 869 (7th Cir. 2011). Soto has not made that showing here.

### 3. Problems with the new custom orthotics

Soto says that he has continued to have problems with his new orthotics and that defendants have been indifferent to those problems. Specifically, Soto asserts that the orthotics "do not fit [his] personal shoes." Dkt. 140, ¶ 32. But he does not dispute that the orthotics *do* fit his Orthofeet shoes, which he is always free to wear. Dkt. 141, ¶ 99 and Dkt. 88-1, at 690. Soto is not constitutionally entitled to orthotics that fit every pair of personal shoes he happens to order. *Cf. Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("Under the Eighth Amendment, Forbes is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). Even so, Manlove has continued trying to address Soto's complaints, even ordering that Soto be sent back to the orthotist to determine whether he "needs modification of his orthotics or another pair for his [personal] shoes." Dkt. 88-1, at 690. Under these circumstances, no reasonable jury could conclude that any of the defendants disregarded Soto's medical needs.

### 4. Failure to physically examine Soto's feet

Soto contends that he reported "bruises, swelling, [and] pain," both in writing and verbally, "to all defendants," Dkt. 121, at 3, and that they violated the Eighth Amendment by failing to physically examine his feet in response. He says that under DAI policy, physical examinations were required within 24 hours of any medical request. In fact, DAI policy only requires "a face-to-face encounter" when a patient complains of symptoms. *See* Dkt. 124-2, at 7 (DAI policy 500.30.11(I)(O)). But even if defendants did violate DAI policy in responding to Soto's reports, prison officials' failure to follow their own policies is not, by itself, a

constitutional violation. *See J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003). What matters for purposes of Soto's Eighth Amendment claims is whether defendants' alleged failure to examine Soto's feet amounts to disregard of a serious medical need.

Soto cites no corroborating evidence in support of his allegation that there were "[n]o exams done in direct response to [his] reporting of bruises, sunk heels causing pain, [and] swelling." Dkt. 140, ¶ 33. The record shows that, at minimum, Soto's feet were examined at each of his three appointments with Migon, *see* Dkt. 88-1, at 6, 8, 9, as well as at his appointment with Loria. *Id.* at 124. Even assuming that no one else ever examined Soto's feet, there is no evidence that a physical exam would have made any difference in Soto's course of treatment. Apart from more supportive shoes and better fitting orthotics, Soto does not identify any other treatment or medical intervention that could or should have been provided. Soto saw doctors and nurses regularly, and they discussed his foot pain when he brought it up. There is no indication that their failure to provide physical exams prolonged or exacerbated his pain.

### 5. Failure to send Soto back to Migon

Soto contends that Manlove disregarded his medical needs by failing to send him back to Migon after his last appointment with her in 2015. But Manlove was entitled to exercise his own medical judgment in determining whether and when to send Soto back to a specialist. Ultimately, he decided to send Soto to an orthotist rather than a podiatrist. Soto believes that he should have been sent to a podiatrist, *see* Dkt. 141, ¶¶ 82, 83, but he provides no evidence that Manlove's decision constituted the kind of gross deviation from accepted professional standards that would give rise to an Eighth Amendment violation. Mere disagreement with a

doctor's medical judgment is insufficient to establish deliberate indifference. *Berry*, 604 F.3d at 442.

Because Soto has failed to provide evidence from which a reasonable jury could find that defendants violated his rights under the Eighth Amendment, I will grant defendants' motion for summary judgment.

## B. Soto's motions for injunctive relief

Soto has filed two motions for injunctive relief. In the first, he asks me to order defendant York's husband, WCI's property sergeant, to (1) stop retaliating against him for filing this case against his wife; and (2) give him back his typewriter. Dkt. 107. As I have previously explained to Soto, *see* Dkt. 83, at 8, allegations of and requests related to retaliation—even retaliation based on the filing of this case—are separate claims that belong in a separate lawsuit. Soto's request that he be re-issued his typewriter raises potential concerns about his access to this court, which I could entertain as part of this case. *See Bounds v. Smith*, 430 U.S. 817, 828 (1977). But Soto managed to fully respond to defendants' motion for summary judgment without a typewriter, so it does not appear that his access to the court was actually impeded. I will accordingly deny Soto's first motion for injunctive relief.

In Soto's second motion, he asks me to issue an emergency injunction directing defendants to send him to a podiatrist and to fix his orthotics. Dkt. 146. This motion simply reiterates the injunctive claims at the heart of this case, which I have already addressed. So I will deny it as moot.

ORDER

IT IS ORDERED that:

1.  Defendants' motion for summary judgment, Dkt. 84, is GRANTED.

2.  Plaintiff José Soto's motions for preliminary injunctive relief, Dkt. 107 and Dkt. 146, are DENIED.

3.  The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered September 25, 2019.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge